UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:

WILLIAM A. SLAVEN and
EDNA VERA SLAVEN,

        Debtors.
_____/

Chapter 7

Case No.  8:16-bk-1201-CPM

### WILLIAM AND EDNA SLAVEN'S MOTION FOR AN ORDER ENFORCING THE AUTOMATIC STAY AND SANCTIONING PROTECT AMERICA, INC. FOR WILLFUL VIOLATIONS OF THE AUTOMATIC STAY

William and Edna Slaven, through their attorneys, according to Sections 105(a) and 362 of Title 11 of the United States Code, respectfully request this Court to enter an order enforcing the automatic stay and sanctioning Protect America, Inc. for willful violations of the automatic stay. In support of their motion, the Slavens state as follows:

### JURISDICTION AND VENUE

This Court has jurisdiction over the Slavens' motion under 28 U.S.C. §§ 157 and 1334. Venue is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding. 28 U.S.C. § 157(b)(2).

### GENERAL BACKGROUND

In early 2014, the Slavens entered into a three-year contract with Protect America for home security monitoring services. Two years later, in February 2016, the Slavens filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 101, *et seq.* Doc. No. 1. At the time of filing, the Slavens believed that they owed Protect America roughly

$320.00. This number is an approximation based upon the monthly cost for Protect America's services—$32.09—multiplied by the term remaining on the Slavens' contract—what they assumed was ten months. In line with their obligations as debtors, Fed. R. Bankr. P. 1007(a)(1), the Slavens scheduled Protect America as a creditor. Doc. No. 1 at 33. As a creditor on the Slavens' creditor matrix, Protect America received notice of their bankruptcy filing.

Despite its knowledge that the Slavens had filed for bankruptcy protection, however, Protect America has continuously attempted to collect money from the Slavens to satisfy a prepetition debt. As discussed below, Protect America persisted in its efforts even after the Slavens' counsel, on multiple occasions, directly communicated with Protect America representatives about the Slavens bankruptcy.

These event began on April 5, 2016, when Protect America first mailed Mr. Slaven an invoice that directed him to pay $32.09 to Protect America "[u]pon [r]eceipt" of that invoice. A copy of the April 5 invoice is attached as **Exhibit A**. Two days later, on April 7, 2016, Protect America emailed Mr. Slaven a collection notice and alerted him that they were unable to process his payment. A copy of the April 7 collection notice is attached as **Exhibit B**. "Your credit card may have expired or lack sufficient funds," Protect America suggested. Ex. B. The Slavens did not respond to these two collection efforts, but were nonetheless concerned and worried.

Days later, the Slavens brought this matter to their counsel's attention. In response, the Slavens' counsel called Protect America with the hopes of resolving what he assumed was a simple miscommunication. After spending roughly thirty minutes on the phone with multiple Protect America customer service representatives, and explaining to each one of them that the Slavens had filed bankruptcy, the Slavens were ultimately told that no one from the legal department was available, but that if he left his name and contact information, a member of the

legal department would return his phone call. Counsel for the Slavens provide this information but he never heard back from Protect America.

Protect America continued in its attempts to collect from the Slavens. On April 20, 2016, Protect America emailed Mr. Slaven another collection notice, this time with the following alert: "* NOTICE: Unable to process payment! *." A copy of the April 20 collection notice is attached as **Exhibit C**. That same day, the Slavens once more contacted their counsel with concern. On that basis, the Slavens' counsel again called Protect America and spent nearly another hour on the phone with company representatives. The Slavens' counsel was still not permitted to speak with an in-house lawyer or another executive who might have been able to manage this problem. Instead, Brandon Brown, one of the Protect America customer service representatives with whom the Slavens' counsel spoke, eventually told the Slavens' counsel that all legal communication must be in writing and sent through traditional mail. The Slavens' counsel accepted that positon and questioned whether he should send his correspondence to 3800 Quick Hills Road, Building 1-100, Austin, Texas 78728, which was the address that the Slavens listed for Protect America in their bankruptcy filings. Mr. Brown confirmed that this was the proper mailing address.

Later that same day, the Slavens' counsel prepared and mailed a letter to Protect America explaining that the Slavens had filed a Chapter 7 bankruptcy case and noting that, as a result, the company is enjoined by federal law from pursuing the Slavens for payment of their debt. A copy of the April 20 letter to Protect America is attached as **Exhibit D**. At first, the letter seemed to have some effect. On May 2, 2016, Protect America emailed Mr. Slaven indicating that "Protect America has received your written request for cancellation." A copy of the May 2, 2016, email is

attached as **Exhibit E**. The thought that Protect America was ending its chase was relieving to the Slavens.

Three days later, however, Protect America was back to its old ways. On May 5, 2016, the company sent Mr. Slaven another collection notice through email, this time asking, "Did you forget to pay your bill?" A copy of the May 5 collection notice is attached as **Exhibit F**. Four days after that, on May 9, 2016, Protect America sent its fourth collection notice by email to Mr. Slaven, with the common refrain, "* NOTICE: Unable to process payment! *." A copy of the May 9 collection notice is attached as **Exhibit G**. Then, on May 12, 2016, the date of the filing of this motion, Protect America engaged in its most recent collection efforts, sending its fifth collection notice by email to Mr. Slaven, again asking the question, "Did you forget to pay your bill?" A copy of the May 12 collection notice is attached as **Exhibit H**.

## LEGAL STANDARD

**A. The Automatic Stay**

The filing of a petition under Title 11 operates as an automatic stay of, among other things, "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under" Title 11. 11 U.S.C. § 362(a)(6). "The automatic stay of § 362 is designed to give debtors a breathing spell from [ ] creditors." *In re White*, 410 B.R. 322, 325 (Bankr. M.D. Fla. 2009) (alteration in original) (internal quotation omitted) (quoting *Ellison v. Nw. Eng'g Co.*, 707 F.2d 1310, 1311 (11th Cir. 1983)). It serves to stop "all collection efforts [and] all harassment . . . [and] permits the debtor to . . . be relieved of the financial pressure that drove [the debtor] into bankruptcy." *Id.* (third alteration in original) (internal quotations omitted)

(quoting *Ellison*, 707 F.2d at 1311). Notably, the protections provided by the automatic stay remain in effect until "the time a discharge is granted or denied." 11 U.S.C. § 362(c)(2)(C).[1]

As a matter of law, any debtor who is subjected to a willful violation of the automatic stay is entitled to "recover actual damages, including costs and attorneys' fees."[2] *Id.* at § 362(k). In appropriate circumstances, a debtor may also recover punitive damages. *Id.*

**B. Willful Violations**

The U.S. Court of Appeals for the Eleventh Circuit has noted that a violation of the automatic stay is willful "if the violator (1) knew of the automatic stay and (2) intentionally committed the violative act, regardless whether the violator specifically intended to violate the stay." *Jove Eng'g, Inc. v. I.R.S.*, 92 F.3d 1539, 1555 (11th Cir. 1996) (citations omitted). In adopting this approach to determining willfulness, the Eleventh Circuit relied in part upon the Supreme Court's explanation of the mechanics of civil contempt, an analogous concept to sanctions for automatic stay violations. "Civil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance. Since the purpose is remedial, it matters not with what intent the defendant did the prohibited act." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949) (internal citations and footnote omitted).

Importantly, as to the first factor, knowledge of a bankruptcy filing is deemed to be knowledge of the automatic stay, *Henkel v. Lickman* (*In re Lickman*), 297 B.R. 162, 190 (Bankr. M.D. Fla. 2003) (quoting *In re Lile*, 103 B.R. 830, 837 (Bankr. S.D. Tex. 1989), *aff'd*, 161 B.R. 788 (S.D. Tex. 1993), *aff'd in part*, *In re Lile*, 43 F.3d 668 (5th Cir. 1994)); *In re Kilby*, 100 B.R.

---

[1] The automatic stay can terminate at a prior point if a case is dismissed or otherwise closed before a court rules on the discharge. 11 U.S.C. § 362(c)(2)(A)-(B).

[2] Section 362(h) provides exceptions to this rule that are not relevant here.

579, 581 (Bankr. M.D. Fla. 1989), and "[n]otice of the bankruptcy petition does not have to come through formal means." *In re Lickman*, 297 B.R. at 190 (internal quotations omitted) (quoting *In re Flack*, 239 B.R. 155, 163 (Bankr. S.D. Ohio 1999)).

**C. Punitive Damages**

A court should award punitive damages "when the violator acts in an egregious intentional manner." *In re Rivers*, 160 B.R. 391, 394 (Bankr. M.D. Fla. 1993) (citing *United States v. Ketelsen* (*In re Ketelsen*), 880 F.2d 990, 993 (8th Cir. 1989)). As Chief Judge Williamson has noted in the past, *In re White*, 410 B.R. 322, 325 (Bankr. M.D. Fla. 2009), many courts rely on the U.S. Bankruptcy Court for the Eastern District of Pennsylvania's decision in *Wagner v. Ivory* (*In re Wagner*), 74 B.R. 898, 903 (Bankr. E.D. Pa. 1987), in deciding whether an award of punitive damages for a willful violation of the automatic stay is fitting. In that case, the bankruptcy court stated that a debtor may recover punitive damages when it is shown that a creditor "acted with actual knowledge that he was violating the federally protected right or with reckless disregard of whether he was doing so." *In re Wagner*, 74 B.R. at 904 (citing *Cochetti v. Desmond*, 572 F.2d 102, 106 (3d Cir. 1978)).

Punitive damages serve two principal objectives: punishing the wrongdoer for inappropriate conduct and deterring the wrongdoer and others in the community from engaging in similar conduct in the future. *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 492 (2008).

## DISCUSSION

Protect America has shown itself to be more concerned with its financial interests than the requirements of federal law or this Court's absolute authority over the Slavens' relations with their creditors. Under nearly any standard—and certainly under the standard established by the Eleventh Circuit—Protect America's actions evidence willful violations of the automatic stay.

What is worse is that the company's actions also establish that it operated with actual knowledge that it was violating the Slavens' federally protected rights. On this basis, it is appropriate for the Court to award the Slavens actual and punitive damages.

Broadly speaking, the automatic stay serves as an injunction against all creditors from collecting on any prepetition debt. 11 U.S.C. § 362(a)(6). A creditor *willfully* violates this injunction when it knows that the automatic stay is in effect or has knowledge that its debtor has filed a bankruptcy petition and, despite this knowledge, engages in any effort "to collect, assess, or recover a claim against the debtor that arose before the" debtor's bankruptcy case. *Id.*; *Jove Eng'g, Inc. v. I.R.S.*, 92 F.3d 1539, 1555 (11th Cir. 1996); *Henkel v. Lickman* (*In re Lickman*), 297 B.R. 162, 190 (Bankr. M.D. Fla. 2003). There is no dispute that the Slavens owe Protect America a prepetition debt. That is precisely why they listed Protect America on their bankruptcy schedules. There is also no dispute that Protect America attempted to collect this debt after the Slavens filed their Chapter 7 case. *See* exs. A-H. The Slavens filed their voluntary petition on February 16, 2016. Doc. No. 1. Protect America mailed an invoice to Mr. Slaven on April 5, 2016, and emailed him four collection notices over the succeeding five weeks. The only remaining issue, then, is whether Protect America had knowledge of the Slavens' bankruptcy case. From the Slavens' perspective, any argument that it did not is indefensible.

To begin, Protect America is listed as a creditor on the Slavens' creditor matrix. Doc. No. 1 at 61. As such, Protect America received notification by mail of the Slavens' bankruptcy case from the Clerk of the Court. *See* Local Rules 1007-1, -2. In addition, the Slavens' counsel sent a letter on April 20, 2016—to the address confirmed to be correct by a Protect America representative—similarly notifying Protect America of the Slavens' bankruptcy case and of the operative automatic stay. Ex. D. Now, there is a *chance* (however unlikely) that neither the

7

notice from the Clerk of the Court nor the letter from the Slavens' counsel reached Protect America. But "[t]he rule is well settled that proof that a letter properly directed was placed in a post office creates a presumption that it reached its destination in usual time and was actually received by the person to whom it was addressed." *Hagner v. United States*, 285 U.S. 427, 430 (1932). Unless Protect America could rebut this presumption with evidence that supports an alternative factual finding, these mailing alone would be enough to establish that Protect America had knowledge of the Slavens' bankruptcy case. *See, e.g.*, *In re Hedetneimi*, 297 B.R. 837, 841 (Bankr. M.D. Fla. 2003).

Other evidence, however, conclusively puts this question to rest. On two separate dates, counsel for the Slavens called Protect America and spoke directly with its customer service representatives. During these two phone calls, the Slavens' counsel spoke with no less than six individuals who represented Protect America's interest. Any number of them could have noted in the Slavens' customer file, or otherwise alerted the appropriate division or department, that the Slavens had sought bankruptcy protection. And perhaps someone did. The problem is that the company failed to act accordingly given notice of this information. Based on these facts, Protect America has willfully violated the automatic stay on at least six occasions. It is thus liable for the Slavens' actual damages, including its costs and attorney's fees. 11 U.S.C. § 362(k).

Protect America's unqualified disregard of the Slavens' rights as debtors under the United States Bankruptcy Code also establish the Slavens' right to recover punitive damages. As explained above, it is beyond dispute that Protect America received notice of the Slavens' bankruptcy case—on likely four occasions—through mailed correspondence and by direct communication over the phone. Yet, the company made the conscious decision to set aside this fact and push on with its steady collection efforts. This at least shows that Protect America acted

with a reckless disregard for the Slavens' rights to be free from harassment and "relieved of the financial pressure that drove [them] into bankruptcy." *In re White*, 410 B.R. 322, 325 (Bankr. M.D. Fla. 2009) (internal quotation omitted) (quoting *Ellison v. Nw. Eng'g Co.*, 707 F.2d 1310, 1311 (11th Cir. 1983)). But the company's actions are more fairly characterized as a demonstration of hostility toward these rights and contempt for the automatic stay, "one of the fundamental debtor protections provided by the bankruptcy laws." *Fla. Dep't of Rev. v. Omine* (*In re Omine*), 485 F.3d 1305, 1314 (11th Cir. 2007), *withdrawn pursuant to settlement*, 2007 WL 6813797 (11th Cir. June 26, 2007).

In considering the imposition of punitive damages, the following factors are appropriate for consideration: "(1) the nature of the defendant's conduct; (2) the nature and extent of the harm to the plaintiff; (3) the defendant's ability to pay; (4) the motives of the defendant; (5) any provocation by the debtor." *In re White*, 410 B.R. at 327. As it turns out, all of these factors cut in favor of the imposition of punitive damages.

First, while it is true that there are cases in which creditors have acted more offensively than Protect America has done here, Protect America's enduring collection efforts in the face of actual knowledge that the Slavens had filed bankruptcy puts this case in a unique category. It seems safe to assume that reasonable actors do what they can to avoid violating federal court orders. Protect America's rejection of this common practice shows an uncommon callousness. Turning to the second factor, Protect America, based on its acitons, must believe that it is doing no harm to the Slavens.[3] But the company is wrong. During a period when the Slavens, like most

---

[3] Alternatively, Protect America may be indifferent as to whether or not it is doing harm to the Slavens.

individual debtors, can hardly handle one more bit of stress or negative emotion, Protect America is bringing more pressure to bear.[4] This is unfair and displays a lack of corporate responsibility.

The third factor looks to Protect America's ability to pay punitive damages. Although information to address this factor directly does not appear to be publically available, Protect America is evidently owned by Rockbridge Growth Equity, LLC, which also owns, among many other businesses, Quicken Loans, Inc. and the Cleveland Cavaliers NBA franchise,[5] and is advertised by its parent company to be "one of the fastest growing alarm companies in the nation."[6] All signs thus indicate that Protect America is more than able to pay punitive damages. The fourth factor considers Protect America's motives underlying its actions, which is also the essential focus of this motion. To the Slavens, Protect America's motives are clear: collect money above all else. The final factor requires little attention. The Slavens have done nothing to provoke Protect America. Indeed, their counsel did what he could on multiple occasions to resolve this matter outside of the judicial process.

## CONCLUSION

Protect America has consciously rejected the Slavens' right to be let alone, defied federal law, and sidestepped this Court's authority over the Slavens' bankruptcy case. Prior cases instruct that the appropriate remedy in such a situation is the imposition of sanctions for actual and punitive damages. "The conduct seen in this case is not acceptable." *In re White*, 410 B.R. 322, 328 (Bankr. M.D. Fla. 2009). Accordingly, the Court should "not hesitate to defend the

---

[4] *Unlike* the majority of individual debtors, the Slavens are struggling on multiple fronts. Mrs. Slaven is in the midst of a courageous fight against cancer.
[5] Protect America, Our Family of Companies, http://www.protectamerica.com/learn/protect-america/company-family (last visited on May 12, 2016).
[6] Rockbridge Growth Equity, Portfolio, http://www rbequity.com/portfolio-companies/protect-america/ (last visited on May 12, 2016).

integrity of the bankruptcy laws and the bankruptcy court, as well as the protections afforded to debtors who seek shelter under them." *Id.*

Dated this 12th day of May, 2016.

> */s/ Adam G. Suess*
> Scott A. Stichter (Fla. Bar. No. 710679)
> Adam G. Suess (Fla. Bar No. 99656)
> STICHTER RIEDEL BLAIN & POSTLER, P.A.
> 110 East Madison Street, Suite 200
> Tampa, Florida   33602
> Phone: (813) 229-0144
> Fax: (813) 229-1811
> sstichter@srbp.com
> asuess@srbp.com
>
> *Attorneys for William and Edna Slaven*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of *William and Edna Slaven's Motion for an Order Enforcing the Automatic Stay and Sanctioning Protect America for Willful Violations of the Automatic Stay* has been furnished on this 12th day of May, 2016, by the Court's CM/ECF electronic mail system to the Office of the U.S. Trustee, Angela L. Welch, Chapter 7 Trustee, Protect America, 3800 Quick Hill Rd., Bldg. 1-100, Austin, TX  78728, and all other parties receiving CM/ECF electronic noticing.

> */s/ Adam G. Suess*
> Adam G. Suess